Filed 6/1/23  In re Q.W. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Q.W. et al., Persons Coming Under the Juvenile Court Law. | B321132 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03074C–D) |
| Plaintiff and Respondent, | |
| v. | |
| K.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee. Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

K.W. (Father) appeals the juvenile court's order terminating his parental rights to his daughter, Q.W., and son, K.W., Jr. Father contends the court misconstrued the evidence and did not properly analyze the beneficial parental relationship exception set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i), as required by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We affirm the order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  ***Events Prior to the Jurisdictional Hearing***

Q.W. (age six), K.W., Jr. (age 20 months), and two of their older siblings[2] came to the attention of the Los Angeles Department of Children and Family Services (DCFS) in late March 2020 when S.W. (Mother) was reported to be acting paranoid and speaking of suicide. According to the reporting party, Mother usually displayed this behavior when using methamphetamine; both parents had used it in the past. Older sibling C.W. confirmed Mother's conduct and also had seen Mother choke Father. DCFS found the referral inconclusive.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  Mother and Father have five children: Ke.W., C.W., Co.W., Q.W., and K.W., Jr. Ke.W. was an adult at all times relevant to this proceeding. C.W. was 17 years old when the family came to DCFS's attention and reached majority during the pendency of the dependency proceedings. Co.W., age 15 at the time the investigation began, was not similarly situated to Q.W. and K.W., Jr., and ultimately was represented by separate counsel. Only the youngest children, Q.W. and K.W., Jr., are subjects of this appeal. The older siblings are discussed only when relevant.

A few weeks later, in April 2020, Mother was reported to have been driving erratically, speeding, and running red lights. She reportedly attempted to hit Father with her vehicle while he rode a motorcycle—all with the children in her car. The children were visibly upset and emotionally distraught. Older children C.W. and Co.W. reported Mother's dangerous and frightening driving, her attempt to strike Father with the car, and their belief that they were going to die during the incident. Mother denied the allegations and accused DCFS of fabricating them. She was charged with child endangerment (Pen. Code, § 273a).

During DCFS's investigation, Father repeatedly promised to get help for Mother, but she did not obtain mental health services. The parents regularly failed to answer their phones, and when they did communicate with DCFS, Mother categorically denied any issues, while Father minimized Mother's conduct to the point of claiming Mother's domestic violence had been at his behest. C.W. and Co.W. continued to report the home was unsafe, but Father denied their concerns.

On June 4, 2020, the children were detained from the parents and placed with the maternal grandmother. DCFS called for law enforcement assistance in removing the children because Father refused to cooperate with the process and possibly threatened the maternal grandmother.

Based on the driving incident, DCFS filed a petition alleging the children were subject to the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm) and (b)(1) (failure to protect). At the detention hearing, the court granted the parents six hours per week of visitation.

In its report filed July 24, 2020, DCFS stated Mother visited the children "approximately three times a week" after the court authorized visitation on June 12, 2020. Father told DCFS he had visited the children twice. On July 7, 2020, the maternal grandmother reported the parents had not had contact with the children since the week of June 29, 2020, because Mother and Father went to Lake Havasu.

In late June 2020, Q.W. and K.W., Jr. were moved to the home of the paternal grandparents. C.W. and Co.W. visited their younger siblings regularly. At first Q.W. cried when her sisters left or when she went to bed without them, but after a few days her crying declined. In July 2020, DCFS filed an amended dependency petition adding allegations relating to Mother's domestic violence against Father and the parents' substance abuse.

As of late July 2020, Mother and Father continued to live together. Mother denied her driving endangered or traumatized the children. Father seemed to understand and agree Mother posed a danger to the children, but he minimized her violent tendencies and the danger she presently posed. Neither parent was receiving services.

III. ***Jurisdictional and Dispositional Hearing***

On August 6, 2020, the court sustained the allegation under section 300, subdivision (a) that Mother endangered the children's health and safety and placed them at risk of serious physical harm, damage, and danger when she attempted to strike Father with her car, as well as when she slapped and punched Father in the presence of one of the children. The court also sustained two allegations under section 300, subdivision (b)(1): (1) Mother's substance abuse and Father's failure to protect the

children from her substance abuse placed them at risk of physical harm; and (2) Father's extensive criminal activity, history of substance abuse, and recent use of alcohol placed the children at risk of serious physical harm.

The court removed Q.W. and K.W., Jr. from the parents and ordered separate monitored visitation and reunification services.

IV. *First Period of Reunification Services*

During the first period of reunification services, the parents made no efforts to address case issues. Mother disputed the legitimacy of the court, refused to discuss the issues underlying the petition, and said she would not "give in" to DCFS bullying by participating in unnecessary services. Father maintained DCFS had unlawfully removed the children, and he neither complied with court orders nor enrolled in services. Neither parent submitted to drug testing.

As of January 2021, Q.W. and K.W., Jr. were receiving mental health services. K.W., Jr., age two, was reported to be making progress at decreasing hitting.

Also as of January 2021, neither parent had a set visitation schedule. Mother visited "multiple times throughout the week," while Father visited the children "typically on the weekends or his days off from work." No concerns had been reported with respect to the visits. DCFS reported Mother and the children were sad when visits ended; there was no report of sadness when Father's visits ended. Father was described as "hands-on with his children during visitation as they play."

The court held the section 366.21, subdivision (e) review hearing on May 26, 2021. At the hearing, counsel for Q.W and K.W., Jr. advised the court it was "very clear" from talking with

5

Q.W. "that both children miss their parents and wish to return home." However, pursuant to section 317, subdivision (e),[3] counsel could not advocate for their return to the parents because they were not drug testing or participating in services.

The court found the parents not in compliance with the case plan and their progress had not been substantial. The court ordered six more months of services and set the section 366.21, subdivision (f) review hearing for November 19, 2021.

## V.  *Second Period of Reunification Services*

On June 9, 2021, the parents told DCFS they believed DCFS and the court had illegally taken their children and they threatened to take Q.W. and K.W., Jr. from their placement. Later that day, the paternal grandfather advised DCFS that the parents had taken Q.W. and K.W., Jr. DCFS reported the abduction to the police, who found the children safe at the parents' home. The children were returned to the paternal grandparents.

On July 2, 2021, the parents again took Q.W. and K.W., Jr. from their placement. DCFS was unable to locate the family. On July 7, 2021, the court issued protective custody warrants for the children and arrest warrants for the parents. After tracking the family's phones pursuant to a warrant, on August 25, 2021, DCFS and law enforcement located the parents, Q.W., and K.W.,

---

[3]  Section 317, subdivision (e)(2) provides that if the child is four years of age or older, the minor's counsel shall interview the child to determine the child's wishes and assess the child's well-being and shall advise the court of the child's wishes. However, "[c]ounsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child." (§ 317, subd. (e)(2).)

Jr. at a campground in Needles, near the California-Arizona border. The children were retrieved and placed in a confidential foster care placement on August 25, 2021.

The children adjusted well to the new placement, although K.W., Jr. "display[ed] concerning behaviors such as hitting, biting, and tantrums. In addition, [K.W., Jr.] spontaneously began to share with the foster mother that he has witnessed the father hitting the mother. [K.W., Jr.] disclosed that father was 'not nice to my mom' and the mother was crying because 'he just hits her.'" K.W., Jr. said Father was "freaking out" Mother.

At a September 1, 2021 hearing, counsel for Q.W. and K.W., Jr. advised the court, "The kids are really hurting after everything that's happened with these parents," and she requested immediate therapy referrals. Counsel also informed the court that despite the parents' actions, Q.W. was "desperate" for contact with them.

The court said, "I . . . believe that the trauma that these children went through are clearly held in the hands of the parents who took these children from placement, refused to cooperate, took these children out of state." The court ordered therapy for the children immediately and suspended the parents' visitation until they appeared in court and were willing to follow court orders.

The court reinstated visitation on September 30, 2021, and as of late October 2021, the parents visited the children by video call twice per week. Father was not engaged in the video calls, and when K.W., Jr. lost interest on a call, Father did not attempt to reengage him.

As of October 2021, the children were both receiving mental health services, and K.W., Jr. was to be assessed soon for

7

additional services, including behavioral therapy to address his biting, hitting, and tantrums.

The parents had their first in-person visit with Q.W. and K.W., Jr. on November 10, 2021. On November 24, 2021, as Mother's visit ended and Father's began, she announced she was taking the children home with her. The children cried and appeared scared. Mother yelled for the children to come to her, and told Father to grab the children, but social workers took the children back into the office. Mother searched the office for the children until the police arrived. The children were driven away from the DCFS office with a police escort.

After this incident, the children regressed. They woke up with nightmares, and K.W., Jr., who had been potty-trained, went back to using pull-up diapers.

In December 2021, the children's counsel told the court Q.W. wanted to continue in-person parent visits. Counsel asked that Father's in-person visits continue because he had not been involved in Mother's confrontation at the DCFS office. The court permitted both parents to continue in-person visits at the DCFS office with a security guard.

At the section 366.21, subdivision (f) review hearing on January 5, 2022, counsel for Q.W. and K.W., Jr. advised the court that Q.W. wished to return home, and if she could not return home she wanted her parents to have additional reunification services. The court terminated reunification services and set the section 366.26 permanency planning hearing (.26 hearing) for May 2, 2022.

Q.W. wanted to keep visiting her family. The court continued the parents' in-person visits once per week, provided they took place "at the DCFS office with security present. And

security needs to be outside the room, not just security in the building."

## VI. *Termination of Parental Rights*

### A. Events Prior to Hearing

In a report filed on April 20, 2022, DCFS advised the court that eight-year-old Q.W. was intelligent, able to articulate her thoughts and feelings, and capable of maintaining interpersonal relationships with people outside her caregivers and family. She was receiving mental health services; she was receptive and enjoyed working with her therapist. K.W., Jr., age three, was verbal and able to articulate when he was upset or needed something; but he was struggling with behavioral issues, namely biting, hitting, and throwing tantrums. He was also receiving mental health services, and he was about to begin specialized therapy targeting his behavioral problems.

Q.W. told the social worker she would like to remain with her caregivers if she could not return to her parents. She felt safe with her caregivers, they were nice to her, and they made her feel like part of the family. K.W., Jr., was too young to interview, but DCFS reported he appeared comfortable and bonded with his caregivers.

The caregivers were willing to adopt Q.W. and K.W., Jr., although they were concerned about their family's safety due to the parents' combativeness. They feared the parents would track them and possibly harm or kidnap the children if parental rights were terminated.

DCFS submitted an addendum report on April 28, 2022, informing the court the caregivers had been approved as prospective adoptive parents. Q.W. had again stated she wanted

9

to live with the caregivers forever and to be adopted if she could not live with her parents.

The following day, DCFS reported to the court that on April 27, 2022, the children had been subjected to an attempted abduction. The DCFS monitor driving the children back to their placement after a parental visit exited the freeway when a vehicle followed her closely and activated police lights. A man claiming to be an FBI agent approached and said his supervisor and law enforcement would respond to the scene. The man produced no identification, wore a Vans T-shirt, drove a Jeep, and did not explain why he stopped the vehicle. He spoke into a walkie-talkie, and a large white vehicle pulled up. The man told the monitor the children were "Court ordered to be the property of the State" who would not be returning to their placement. The monitor began to question whether he was an FBI agent.

The man demanded the children exit the car and attempted to open the car door. The children were crying and said they wanted to go back to their caregiver. When Q.W. told the monitor she recognized the man as her parents' friend, the monitor immediately called 911, prompting the man and the other vehicle to flee. The monitor and the children were escorted home by police. After this incident, K.W., Jr. began to show physical symptoms of distress, including diarrhea and a fever.

On May 2, 2022, the court postponed the .26 hearing until May 9 and suspended visitation. On May 6, DCFS submitted a last minute report containing the caregivers' description of parental visits. The children became excited about visits with their parents: Q.W. would pick out activities and crafts to do with them, and K.W., Jr. would be energetic. On the way home after visits, the children would describe what they had done.

10

They would still be happy and energetic on the drive, but once home, K.W., Jr. would become defiant, throw tantrums, make a mess of his bedroom, and throw his belongings.

K.W., Jr.'s diarrhea and fever after the most recent abduction attempt had gone away, but he woke up five to six times per night with night terrors and crying. He was wearing a pull-up diaper at night because he had started having accidents and soiling himself.

Q.W.'s therapist reported trying to discuss the incident with Q.W., but she had "shut down" and did not seem ready to process the trauma. Q.W. would discuss school, friends, and play, but not her family.

The social worker attempted to interview Q.W. about the incident, but Q.W. was short in her responses and avoided detail. Q.W. said she recognized the "FBI person" as her parents' friend because his daughter was her friend. The man wanted to take her, and she felt "sad" and "scared" during the incident.

Q.W. wanted to continue visits with her family. She denied being afraid of her parents or being physically harmed by them. Q.W. wanted to live with her parents, but if she could not, then she wanted to live with her caregivers.

B. The .26 Hearing

1. *Q.W.'s testimony*

Under examination by Mother's counsel, Q.W. testified she enjoyed her visits with Mother, during which they colored, made bracelets, and discussed how she was doing in school. Q.W. enjoyed the conversations. When asked if she missed Mother, Q.W. said yes and began to cry.

The court went off the record; when proceedings resumed, the court noted Q.W. was sitting in the lap of the caregiver and felt "more comfortable" that way. Father objected to Q.W. sitting in the caregiver's lap but agreed to her sitting next to the caregiver while she testified.

When testimony resumed, Q.W. testified she felt sad when Mother left at the end of visits, and she would like to continue visiting with Mother. Mother had never hurt Q.W. and she was not afraid of Mother. She wanted to live with Mother at some point. Q.W. also testified she missed Ke.W. and C.W, she enjoyed visits with them, and she would like to continue the visits.

When questioned by Father's counsel, Q.W. testified she enjoyed spending time with Father; they played with cars during visits. If it were her choice, she would live with her parents. She understood what adoption meant, and she wanted to be adopted if she could not live with her parents. She understood she might never see her parents or sisters again if she were adopted. It would make her sad not to see her parents again. During her testimony, Q.W. had to be instructed to stop holding the caregiver's hand.

### 2. *Father's Testimony*

Father testified he visited Q.W. and K.W., Jr. weekly for two hours at a DCFS office. When asked why his visits were only once per week, he said that was what the commissioner had ordered, and when he asked someone about more visits, the person said she would look into it but never responded.

Q.W. and K.W., Jr. were excited to see Father at visits. Father said he "bring[s] them their RC cars to play with, that's something that we've always done. [Q.W.] likes to play memory and Uno, and games like that. My son likes [to] kick the ball.

12

We draw, watch [Q.W.] do gymnastics."  At the end of visits, the children were "very sad and confused."  They would ask why they could not go home, and Q.W. had written Father a letter begging to come home.

Ke.W. typically accompanied Father on visits.  Father said Q.W. and K.W., Jr. were very close to and bonded with Ke.W. and C.W.

In Father's view, being removed from her parents "has destroyed [Q.W].  She is—she has no idea why she was removed. . . . .[S]he just doesn't understand why she can't come home.  [¶]  And I can just tell by her, just her overall being that she's sad a lot.  She puts on a good face, but I know that she's very sad."  Father said K.W., Jr. wanted to come home.  He emphasized that the family "did everything together.  And we are very family[-]oriented.  We vacation an awful lot in our vacation home . . . ."

Father said it was not in Q.W. and K.W., Jr.'s best interest to be adopted because, "I haven't done anything.  And to have my kids taken.  And I've done very—I've been very mindful not to discuss the case with them.  You know, so it's hard when they ask me.  And, you know, I do my best to give them a comforting answer.  But at the end of the day, they just don't understand.  And because, you know . . . my wife home-schooled [Q.W].  She was—we were always together with [Q.W].  And like I said, my son, you know, now has—you know, he was with me for 18 months.  And then he was with my father.  But the minute that he sees me, he just—it's just—it's hard.  [¶]  I think family is the most important thing.  And I do appreciate the love and the kindness that the caregivers appear to be providing for my children.  But at the same time, you know, no one is ever going to

13

love them like their mom and dad.  [¶]  And I know that my son can be a handful.  And I just want an opportunity to raise my kids."

### 3. *Mother's Testimony*

Mother testified that at no time on or before April 27, 2022, had she instructed anyone to take the children away from DCFS. Her counsel asked if anyone had ever told her they were going to try to take the children from DCFS.  The children's counsel objected to the question as leading, and the court found the question irrelevant because, "[a]t a .26 hearing, the only relevant factors are the relationship between the parents and the children and the visitation, not any allegations or statements."

Mother had visited Q.W. and K.W., Jr. since they were removed from her care.  C.W. attended Mother's visits.  C.W.'s relationship with Q.W. and K.W., Jr. was very close; they were interactive, and they laughed and had fun.  During visits, Q.W. and K.W., Jr. were happy.  Ending visits was hard because the children wanted to come home.

Mother believed the children would benefit from a continued relationship with her "[b]ecause I love them and they want to be home, they need to be home.  This is killing them. . . . [I]t is in their best interest and it is for their wellbeing to be home."  Asked how the children would be better off at home, Mother responded, "[W]e're their family.  We were a very close family.  We did everything together.  And even when they were with my dad and my mom, they were sad, they wanted to be home."  Before removal, the family read, did activities, vacationed, and spent time together and with friends.

Mother believed Ke.W.'s visits with Q.W. and K.W., Jr were beneficial to the children "[b]ecause they play with their RC cars,

14

and I know that that makes them happy. And they hug them. And when they do get there, I am usually clocking out, and I see their interactions. And it's good, it's loving."

### 4. *Other Testimony*

The parents' oldest child, 21-year-old Ke.W, testified she had visited Q.W. and K.W., Jr. in person for two hours each week since December 2021. She and Father visited the children together. During visits, they played with toy cars, colored, and played card games, and the children laughed and smiled. At every visit Q.W. and K.W., Jr. told her they missed her. At the end of visits, Q.W. and K.W., Jr. were sad to leave, wanted to come home, and cried.

Ke.W. loved Q.W. and K.W., Jr. and she believed they loved her. Q.W. and K.W., Jr. would benefit from continuing the sibling relationship because, Ke.W. said, "[F]amily is really important. And you're always going to have your family. I think they should be able to be with their family. And we always had a really close bond."

C.W. testified she had visited Q.W. and K.W., Jr. weekly since the prior December or January. During visits, they colored and read. Sometimes Q.W. did gymnastics, and C.W. played with K.W., Jr. and his cars. The children were happy during visits but became sad when visits ended.

C.W. believed she had a bond with Q.W. and K.W., Jr.; she loved them and believed they loved her. At visits the children said they missed Mother and C.W., and they wanted to be home. C.W. believed the children would benefit from a continued relationship with her, testifying, "They are like my best friends. And not being with them is so hard. So, seeing them would be beneficial. Because like we make each other happy."

15

Mother called the social worker to testify about her report that after visits the children were happy and energetic, but when they returned home, K.W., Jr. was defiant, made a mess in his room, and threw his possessions. The social worker testified the caregivers reported this typically happened after virtual or in-person visits with the parents. The social worker opined K.W., Jr.'s conduct "would be in regards [to] the trauma from a child having to depart from his biological parents coming placement [*sic*] with his current caregivers, acting out in that sense." She testified the behavior possibly was caused by the trauma of separating from the parents.

### C.    Argument

Counsel for Q.W. and K.W., Jr. told the court Q.W. "wanted the court to know she loves her parents and her sisters, and this is a very hard decision for her, but she wanted the court to know that she would like to be adopted, and inform the court today under very challenging circumstances that everyone has seen, that if she cannot live with her parents, she would like to be adopted." Noting the question was not a return to parents but the selection of a permanent plan, the children's counsel argued for the termination of parental rights. Counsel argued the parents failed to demonstrate a relationship with the children that met the *Caden C.* standard, and the benefits of permanency and the adoptive home outweighed those of legal guardianship.

Mother argued the beneficial parental relationship and the sibling relationship exceptions to the termination of parental rights applied. The parents' regular visits evidenced their love for their children. Mother asserted there was a "real relationship" between the parents and the children: the children were happy during visits, they played games and talked, and the

16

"parents have the ability to teach their kids things that others would not." Mother contended there was a strong bond between Q.W. and K.W., Jr. and their siblings, and it was in their best interest to continue the sibling relationship as well.

Father argued the beneficial parental relationship exception applied. He visited consistently, the children enjoyed spending time with him, and there had never been problems with his visits. Father contended, "There is more than sufficient evidence . . . both children clearly love their father, love spending time with him, and have asked him repeatedly that they wish to come home and cannot. And they express that they did not understand why they weren't able to come home."

Father emphasized that Q.W. had testified she wanted to live with her parents, the children "were raised in the family home with both their parents, with all of their older siblings in the same home before they were removed," and there was a close relationship among the children, their parents, and their siblings. He argued Q.W.'s distress at the mere mention of missing her mother and K.W., Jr.'s post-visit behavioral problems showed their attachment to their parents. The evidence, Father argued, also showed it would be detrimental to the children for their relationship with their siblings to be terminated.

DCFS argued no exceptions to adoption applied. DCFS conceded the parents had visited consistently, but argued they had not demonstrated a beneficial relationship with the children or that any detriment would result from terminating parental rights. DCFS maintained that contact with the parents caused the children's regression and negative behaviors and that the children were torn between their parents and the stability of their placement. DCFS acknowledged the older siblings' strong

17

feelings toward the children, but argued mere sadness from the siblings and positive visits did not demonstrate the sibling relationships outweighed the benefits of permanency.

   D.   The Court's Ruling

The court found the children adoptable.  The court noted they had been in their placement since August 25, 2021, and therefore had been with the caregivers for close to one year.

The court said it did not hear any evidence "the children would be harmed if I were to terminate parental rights."  The court saw "the tears of the parents and their older siblings about the relationships that they will lose," and it attributed Q.W.'s emotional response during her testimony to the tremendous pressure of testifying.

The court continued, "But she has a relationship with the people who live with her.  But, again, that's not the key factor here.  Whether or not the parents complied with the prior court-ordered case plan is not a factor here.  The factor is what are we going to do today?  If I were to order legal guardianship, would that be in the best interest of the children?"  The court said, "[N]o.  Because that will essentially put the children in the same situation they are in now, but until they turn 18."  The court believed it was not in their best interest to be "in a constant state of flux"; based on their ages and the intent of the Legislature, they should have "the right of permanency that's appropriate.  And the permanency for their ages eight and three are adoption."

The court agreed the parents had visited consistently.  The court said the next question was whether an emotional bond existed between the children and their parents, and this involved consideration of numerous factors.  One factor was how much of their lives the children had lived with their parents.  The court

18

first said, "So this case has had the children in a foster home for approximately two years," which was incorrect because the children were placed with grandparents for the first year of their out-of-home placement. The court immediately said, correctly, "So for approximately two years, the children were removed from the care of the parents." The court observed that as K.W., Jr. was nearly four, "the approximate time that he spent with his parents versus out of their care is even at this point." Eight-year-old Q.W. had spent "the majority of her life with her parents in their home," the court said, but then inaccurately stated "she spent the last two years with [K.W., Jr.] in the home that they are currently living" in. The court noted the parents' visits had been consistent but were once per week.

The court noted the necessary emotional attachment and bond flowed from the child to the parent, not from the parent to the child. The court said it, "heard a lot from the parents today about . . . how the family did a lot of things together and they did what a family does and they went on vacations together." While that was important, "[t]here is always going to be some form of benefit that is derived from a biological parent with a child." The issue was, "are they going to be harmed if I terminate the parent-child relationship today?"

The court rejected Mother's argument that the parents could teach the children "things that others would not," stating that although the parents had visited, "I don't agree that they taught the children things that they weren't taught or they couldn't be taught by anyone else. I don't think that they developed a relationship with the children that was so important that they had to continue that relationship or the children have to see the parents in order to be able to function." The court

19

thought counsel's argument about the children's behavior after visits "was somewhat downplaying the trauma that they experienced from some of the contact and also the difficult feelings that the children are experiencing." It concluded, "When looking at all of the facts on a whole, the parents failed to meet the burden by establishing that emotional attachment that is compelling and that would provide the children with detriment if I were to proceed today to terminate parental rights."

The court said it was not considering the facts of the petition or the parents' lack of cooperation. The court also found the sibling relationship exception did not apply. Finding no exceptions to adoption, the court terminated parental rights.

## DISCUSSION

Father contends the court misconstrued the facts and the evidence, imposed an inappropriate consideration in its analysis of the beneficial parental relationship exception, and therefore failed to recognize that Q.W. and K.W., Jr. had significant emotional attachments to their parents and would suffer detriment if Father's rights were terminated.

### I. *Applicable Law and Standard of Review*

"To guide the court in selecting the most suitable permanent arrangement" for a dependent child who cannot be returned to a parent's care, section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see § 366.26, subd. (b).) At the permanency planning hearing, if the court finds that the child is likely to be adopted and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for

20

adoption.  [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630–631; see § 366.26, subds. (c)(1)(B)(i)–(vi), (c)(4)(A).)

One of the exceptions, the beneficial parental relationship exception, applies when (1) "the parent has regularly visited with the child"; (2) "the child would benefit from continuing the relationship"; and (3) "terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).)  "The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, at p. 632.)

To establish the second element, that the child would benefit from continuing the parental relationship, the parent must show the child has a "substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  "When the relationship with a parent is so

important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

The parent bears the burden to show the statutory exception applies. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) When a parent meets that burden, the beneficial parental relationship exception applies such that it would not be in the best interest of the child to terminate parental rights. In that case, the court must select a permanent plan other than adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

We review the court's findings using a hybrid approach: for the first two elements, which require factual findings (parental visitation and the child's emotional attachment), we apply the substantial evidence standard of review; and for the court's weighing of the relative harms and benefits of terminating parental rights, we use the abuse of discretion standard. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) However, when a party with the burden of proof did not carry that burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

## II.     *The Juvenile Court's Caden C. Analysis*

The first element of the exception, regular visitation, is not in dispute; by all accounts the parents maintained regular visitation and contact with Q.W and K.W., Jr.

On the second element, whether the child would benefit from continuing the relationship, "it is critical for the juvenile court at the second step of the analysis to consider the evidence showing whether the parent's actions or inactions 'continued or developed a significant, positive, emotional attachment from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) Father argues the juvenile court erred in multiple respects when analyzing the second element.

### A.     Caregiver Relationships

Father argues the juvenile court improperly relied on the children's relationships with their current caregivers in finding the second element of the beneficial parental relationship exception was not met.  As Father notes, the second element does not involve consideration of a child's relationship with the caregiver.  "That a child may have more than one person who stands in the role of parents does not defeat the exception; a strong relationship with one parental figure does not negate the harm the child would experience if the child were to lose a significant and positive relationship with the parents." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848.)

Father has not demonstrated the court impermissibly considered the children's relationships with their caregivers in evaluating the second *Caden C.* element.  Although Father does not identify in his argument the evidence on which he relies, it appears he intends to refer to the juvenile court's statement that

Q.W. had "a relationship with the people who live with her," the caregivers.[4] While the court did say Q.W. "has a relationship with the people who live with her," it immediately discounted that fact, saying, "But, again, that's not the key factor here." The court also noted the parents' lack of case plan compliance was not a factor to consider, identified the operative question as whether legal guardianship was in the children's best interest, and concluded it was not.

Next, the court performed the *Caden C.* analysis. At no point in that analysis did the court discuss the children's relationships with their caregivers. The court did mention the duration of the children's placement with the caregivers, but it did so in the course of calculating the portion of the children's lives spent in their parents' custody, a consideration endorsed in *Caden C.* (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Father has not established the court relied on the children's relationships with the caregivers in finding the second element of the exception was not met.

B.    Visitation Frequency

Father argues the court "misconstrued the evidence regarding the nature of Father's visitation over the life of the case as having occurred once per week." Father contends he visited more than once per week "for the majority of the case."

_____

[4]    Father set forth the evidence for his arguments separately from the arguments, and he did not always identify which evidence pertained to his individual contentions. However, the only statement in the evidence paragraph pertaining to the children's relationship with the caregivers is the court's statement that Q.W. had a relationship with the people she lived with.

24

He asserts that during the first year of the children's out-of-home placement, when they were placed with their grandparents, "Father visited the children multiple times per week, on the weekends and on his days off."

We have reviewed the evidence in the record pertaining to visitation. In a report filed July 24, 2020, DCFS reported Mother visited the children "approximately three times a week" after the court first authorized visitation on June 12, 2020. Father told DCFS he had visited the children twice.

On July 7, 2020, the maternal grandmother reported the parents had not had regular visitation with the children since the week of June 29, 2020, because Mother and Father had gone to Lake Havasu.

DCFS reported in January 2021 that Mother visited "multiple times throughout the week." Father was not described as visiting the children multiple times each week: he visited "typically on the weekends or his days off from work."

Father relies on two reports, prepared well after the first year of the children's out of home placement, that summarized visitation during the first year. Those reports, filed in October 2021 and April 2022, state that before the parents took the children from their placement in July 2021, "it was reported that Mr. and Ms. W[.] visited the minors . . . multiple times throughout the week . . . ." This does not appear to be consistent with the contemporaneous reports of Father's visitation. Accordingly, it appears the evidence is at least unclear, if not in conflict, as to the frequency of Father's visits during the first year of the children's out-of-home placement.

Father next states the children were with him from July 2, 2021 to August 25, 2021, "albeit in violation of court orders." To

any extent Father intends to suggest that removing the children from their placement without court authorization constitutes visitation or is relevant to determining visit frequency, we are aware of no authority supporting such a proposition, and Father supplies none.

As Father notes, visitation was suspended during September 2021; this was because the parents had absconded with the children.

Father asserts that virtual visitation resumed twice per week after September 30, 2021, and that "beginning January 5, 2022 and through the hearing on May 9, 2022, visitation was once per week in-person." Father's statements imply he visited the children twice per week from the end of September 2021 through early January 2022. That is not the case. The twice-weekly visits lasted for less than six weeks: on November 10, 2021, Father began visiting the children once per week. This continued until May 2, 2022, when his visitation was again suspended.

Upon our review of the record, therefore, it appears that from June 2020 through June 2021, Father may have visited the children multiple times per week during some weeks, but he did not visit at all during others. From early July 2021 to September 30, 2021, there was no visitation, first because Father and Mother took the children from their placement, and then because visitation was suspended. For approximately six weeks between September 30, 2021, and November 10, 2021, Father visited the children twice per week, but his visits were once per week from November 10, 2021, until May 2, 2022, when they stopped entirely. The evidence does not preclude, but neither does it

unequivocally establish, that Father visited the children multiple times per week for the majority of the case.

More fundamentally, we are not persuaded that the court's failure to perceive there were any periods of time during which Father visited more often than once per week impacted its evaluation of the second *Caden C.* element. Father claims that "[h]ad the juvenile court understood the true nature of Father's visitation, it would have found that those visits continued the significant emotional attachments that [Q.W.] and [K.W., Jr.] formed while living with Father," but this argument is conclusory and speculative. He offers no argument demonstrating that if the court had been aware of his possible multiple visits per week during the first year of the children's out-of-home placement and his six weeks of twice-weekly virtual visitation in October and November 2021, it would have found the children had a substantial, positive, emotional attachment to him such that they would benefit from continuing the relationship (*Caden C.*, *supra*, 11 Cal.5th at p. 636), and on this record we cannot identify any reason to conclude that would have been the case.

C.    Duration of Placement with Caregivers

At the start of its comments, the court accurately stated the duration of the children's placement: the court said, "They have been living in the home with their current caregiver since about August 25, 2021, so we're going on close to a year that they have been living in the same home with the same caregivers." However, as Father points out, the court later confused the length of time the children had been out of the custody of their parents with the duration of their placement with their then-present caregivers. The court said the children had been in their current placement for the past two years, when in fact they had

27

been placed with grandparents for just over one year, were missing for approximately two months, and then were placed with the caregivers from late August 2021 through the .26 hearing in May 2022.

Father argues if the court had understood this timing, "it would have better understood the nature of the bond between Father and the children," but he does not argue the court would have analyzed the second element any differently. Nor can we envision any way the court's inaccuracy impacted its analysis. The court misstated the duration of the children's then-current placement in the course of evaluating a factor identified in *Caden C.*, " 'the portion of the child's life *spent in the parent's custody*.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632, italics added.) Despite its misstatement, the court accurately calculated the relevant time period, how much of the children's lives had been spent in Father's custody.[5]

### D.    Evidence of Detriment

Father argues the court's analysis of the second *Caden C.* element was flawed because it "misconstrued the evidence bearing on the harm and/or detriment that would befall the children if parental rights were terminated," and the evidence established they would suffer detriment from the termination of their relationship with him. Father sets forth the evidence that the children missed him, enjoyed visiting with him, were excited

---

[5]    To whatever extent Father intends to argue the time when the parents absconded with the children should be counted as time in parental custody, Father has not demonstrated that this period of slightly less than two months would have shed any light beneficial to him on the "nature of the bond between Father and the children."

28

for visits and happy during visits, felt sad when visits ended, and wanted to return home, as well as Q.W.'s statement that she would be sad if she could not visit with him in the future. He argues if the court had understood that "being 'sad' at the end of visits, continuing to miss the parent despite being comfortable in an out of home placement, and being sad at the thought of never seeing the parent again can be evidence of detriment, it would have realized there was evidence of harm and/or detriment to the children."

Although Father claims the court misconstrued this evidence in assessing the second element of the *Caden C.* analysis, evidence bearing on whether the termination of a child's relationship with a parent would be detrimental to the child is not considered when analyzing the second element. Detriment is the third *Caden C.* element. (*Caden C.*, *supra*, 11 Cal.5th at p. 633 ["Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption]".) Father's argument, therefore, fails to establish any error in the court's ruling that the parents failed to carry their burden on the second element, that is, they failed to show the children would benefit from continuing the relationship.

Moreover, any error in the court's evaluation of the third element does not require reversal because the parents failed to meet their burden on the second element. Only when a parent establishes the first two elements of the beneficial parental relationship exception does the court proceed to determine whether terminating the attachment would be detrimental to the

child even when balanced against the countervailing benefit of a new, adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

III.    ***Conclusion***

As discussed above, Father's arguments that the court relied on an improper consideration and misconstrued the evidence do not establish error in its analysis of the second *Caden C.* element.  Because the court determined the parents failed to carry their burden of proving the beneficial parental relationship exception applied, Father must demonstrate on appeal that his "evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)  Father has not attempted to make that showing, and from our review of the record, the evidence of the quality and nature of the children's relationship with Father did not compel a finding in his favor on the second element or on the exception itself.

## DISPOSITION

The order terminating parental rights is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

GRIMES, J.                    WILEY, J.

30